STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**24-134**


ANGELA GREAUD

VERSUS

JAHANYAR KHORSANDI, M.D.


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 87,248
HONORABLE KEITH R. J. COMEAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, D. Kent Savoie, and Van H. Kyzar, Judges.

**AFFIRMED.**

Patrick R. Jackson
Kyle McCotter
Patrick R. Jackson, APLC
4442 Viking Drive, Suite 100
Bossier City, LA 71111
(318) 752-3335
COUNSEL FOR PLAINTIFF/APPELLANT:
    Angela Greaud, Individually and on Behalf of Steven Greaud

Alan K. Breaud
Timothy W. Basden
Breaud & Meyers
P.O. Box 51365
Lafayette, LA 70505
(337) 266-2200
COUNSEL FOR DEFENDANT/APPELLEE:
    Jahanyar Khorsandi, M.D.

**KYZAR, Judge.**

In this medical malpractice action, Plaintiff, Angela Greaud, individually, and on behalf of her deceased husband, Steven Greaud, appeals from the trial court judgment in favor of Defendant, Dr. Jahanyar Khorsandi, dismissing her claims against him, with prejudice. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

This matter stems from the sudden death of Steven Greaud, the husband of Plaintiff, which occurred at their Crowley, Louisiana home on April 11, 2015, one day after his final appointment with his primary care physician, Defendant, a family medicine physician. Mr. Geraud was forty-three years old at the time of his death.

Mr. Greaud's death certificate lists "Poly Drug Overdose" as the sole cause of his death, as determined and certified by Dr. Mark Dawson, the Acadia Parish Coroner. A toxicology report attached to the death certificate confirmed that blood taken from Mr. Greaud's heart following his death was positive for amphetamines; benzodiazepines (Xanax); opiates (hydrocodone, oxycodone); analgesics (Soma, meprobamate); anti-depressants (Trazodone, Cymbalta, chlorophenylpiperazine); antihistamines (chlorpheniramine); cardiovascular agents (Norvasc); and stimulants (caffeine).[1]

Subsequently, Plaintiff sought review of a medical malpractice claim against Defendant, in which she alleged that he breached the standard of care through his "negligent lack of medical assessment, care, and treatment" and that as a result, Mr. Greaud "was denied appropriate medical care, and was over medicated to such a

---

[1] The toxicology report lists the concentration and the therapeutic range (indicated in parenthesis) for each substance found in Mr. Greaud's system, including amphetamines 565 ng/ml (10–100); hydrocodone 250 ng/ml (10–40); oxycodone 509 ng/ml (10–200); and antihistamines 280 ng/ml (10–40).

severe stage that it eventually caused his death." In its July 25, 2018 opinion, the medical review panel found that Plaintiff failed to prove that Defendant breached the standard of care applicable to him in his treatment of Mr. Greaud.

On September 24, 2018, Plaintiff filed suit against Defendant, alleging that he overprescribed pain medication for her husband causing his addiction to drugs and ultimate death via a drug overdose. The matter proceeded to a jury trial.

At trial, Plaintiff testified that Mr. Greaud's condition and behavior deteriorated over the six years he was treated by Defendant, March 6, 2009—April 10, 2015. She stated that in August 2009, he passed out while driving in Abbeville and that on another occasion, he hit a concrete pillar after putting his car in drive and then passing out. She said that his behavior, attitude, work performance, and ability to parent her autistic son declined and that she spoke to Dr. Dawson, the coroner, about having him committed pursuant to an order for protective custody. Plaintiff testified that Mr. Greaud changed jobs multiple times and began selling his possessions. She stated that in August 2012, he became confused and ended up in Cecilia while on his way home from Lafayette, and she later learned that he was found passed out in the parking lot of a Crowley Auto Zone.

Plaintiff described Mr. Greaud's condition during his fifth year of treatment by Defendant, as follows:

> So, basically, he was a shell of a person. He largely walked around in a stupor. You heard before falling [sic] asleep over the dishwasher, falling asleep with his face, I mean, literally his face in his food at the dinner table. He would fall asleep watching television. I mean, just basically – I came home one day. Landon [her son] was in a panic because he was passed out in the car under the carport. We don't have a garage, but we have a carport. And Landon was pretty panicked about that. We couldn't allow Landon to be in a vehicle with him anymore. I made it a point that Landon was no longer to be in a vehicle with him. At the time Landon had a DSW worker, which is a direct service worker or support worker. He received that through Medicaid

2

services because of his disability. So, you know, there was a lot of discussion about not allowing Landon to be alone in his care. He, he, he just – he wasn't Steve anymore at that point.

Plaintiff stated that Mr. Greaud again passed out while in a Walgreen's drive-thru in April 2014. Although he was tested for seizures following this incident, the test results were normal. By early 2015, "he was always in a stupor, passing out. I mean, this had become our normal." She stated that in March 2015, Mr. Greaud could not walk up the steps of a hair salon, and he was slurring his words and falling over himself. She said that people expressed concerns regarding his behavior.

Plaintiff testified that on the day Mr. Greaud died, she was with him from 10:00 a.m. until she started cooking supper at 8:00 p.m., during which time they argued about him seeing Defendant and whether he was overmedicated. She stated that by the time she started cooking, he appeared to be non-perceptive. Plaintiff testified that while Mr. Greaud was sorting his prescription medication in their bedroom, he kept falling over, slurring his words, and had difficulty walking. She testified that when she eventually returned to the bedroom, he was wedged between the wall and the bed and was unresponsive. He was pronounced dead by emergency medical technicians (EMTs).

Plaintiff stated that other than talking to the EMTs, she did nothing to determine whether Mr. Greaud had taken a larger quantity of medication than prescribed. She stated that his pill organizers looked no different when she found him than when she left him earlier. However, she admitted that she has no idea what happened to the pill organizers as she has not seen them since then. She denied that she told the EMTs that she had an altercation with Mr. Greaud prior to his death as "altercation" is not a word she typically uses. While she admitted that they argued, she denied that there was a physical fight.

3

Plaintiff testified that Mr. Greaud did not use illegal drugs or alcohol and that she never noticed him misusing his medication:

> Steve was very diligent about filling out these pill boxes with the amount of, you know, this is Monday's dose, this is Tuesday's dose, this is Wednesday's dose, and any time we tried to bring up the idea of addiction with him he would refer back to that. I can't be addicted, look, I'm taking everything exactly as prescribed.
>
> Count my pills. Like almost throwing it in our face. Here. You know, here's my pill box. You can count them. They're all there.
>
> He was very meticulous about pointing out those pill boxes.

Plaintiff was adamant that Mr. Greaud's overdose was not intentional. She explained that he was haunted by his brother-in-law's death being ruled a suicide, and "he always said he would not do that to his family." She further stated that after her father suffered a massive heart attack, Mr. Greaud was insistent that she leave her father's room after he was taken off life support:

> He did not want me to see my father take his last breath. He said I've seen it before. It's, you know, not something you want to stick with you. I don't think he would do that to Landon, particularly. I don't think he would do that to me, to have us walk in and find him that way.

Plaintiff knew that Mr. Greaud suffered from bradycardia, a slow heartbeat, and sleep apnea and that he was being treated by multiple doctors. When questioned as to why she called his cardiologist, to ask if he could have died due to a seizure, she stated:

> A.      Because Steve described these episodes of fainting as seizures. He did not use the word "syncope." He used the word "seizures."
>
> So, when he would pass out in front of the dishwasher or in his plate, you know, and had these fainting spells, it was either, you know, I stood up quickly and, you know, passed out or I had a seizure. That was his terminology. I can only guess that I was trying to put pieces together.

4

Q.      Did you later ever come to find out whether Steve actually ever had a seizure, not just the day he died but at any point?

A.      I did not.

Dr. David Libert, Plaintiff's family medicine expert, testified that Mr. Greaud's death certificate indicated that he died of a polydrug overdose. He stated that what stood out to him on the toxicology report was the hydrocodone/oxycodone levels as well as the presence of alprazolam (Xanax), Soma, and Soma's metabolite, meprobamate, all of which were prescribed by Defendant, and which make up what is referred to as the Houston Cocktail. While acknowledging that no autopsy was performed, Dr. Libert opined that based on the amount of drugs found in Mr. Greaud's system, it was more likely than not that his death was caused by a polydrug overdose:

> Without an autopsy, we cannot – we cannot prove or rule out this being a heart attack or a stroke or any – or any number of things, but in this case, more likely than not, with the evidence that is here, with the amount of medication that is in his system, with his history of taking these medications, with the fact that these medications, when taken in that combination, can cause overdose and death, and the fact that he died of a polydrug overdose, as per his death certificate, is more likely than not the cause of Mr. Greaud's death, and anything else other than that is speculation because there was no autopsy.

He stated that there was no indication that Mr. Greaud died of a heart attack. He further stated that Plaintiff made no mention in her deposition of a physical altercation with Mr. Greaud prior to his death. He said that as the term "altercation" does not imply a physical battery or assault, the altercation could have been verbal.

Dr. Libert opined that given the totality of Mr. Greaud's behavior, Defendant breached the standard of care by continuing to prescribe increasing amounts of narcotic medication:

> The amount of narcotics that were being prescribed was excessive and long-term. There's no – there's no indication that long-term, high-dose

5

narcotics have any treatment value in treating patients who have nonmalignant pain, meaning pain not from cancer. In fact, there's a lot of indication that a patient will develop a tolerance to those medications, requiring more and more of those medications to get a certain effect, thus then putting them at higher risk for overdose. And then factoring in multiple medications that have similar effects – adverse effects makes it a dangerous practice in a person who does not have cancer.

He further opined that the combination of medication prescribed was inappropriate because it "increased the – the possibility of addiction, misuse, and increases the possibility of overdose and death, especially that combination of opioids and Soma and Xanax." He stated that this combination is very dangerous as all three medications act to suppress the respiratory center.

Dr. Gary McGarity, an expert in pharmacy, pharmacology, and pharmacokinetics, testified that Mr. Greaud died because the combination of drugs prescribed over six years by Defendant, in increasing dosages and quantities, depressed his respiratory center such that he stopped breathing. He explained that as Mr. Greaud aged, he could no longer handle the increasing levels of medication in his body, and on April, 11, 2015, "it was just too much for him to handle[]" as "there were some nerve cells that just weren't transmitting anymore." Dr. McGarity opined that it was clear that Mr. Greaud was regularly stoned on his prescription medication as evidenced by Plaintiff's June 14, 2014 report that he was falling asleep while eating, was very disoriented and confused, and was driving recklessly. However, he acknowledged that he was not aware that Mr. Greaud suffered from sleep apnea or that he was being treated for seizures. He further pointed out that there was no indication in Defendant's records that Mr. Greaud was misusing his medication on April 10 or 11, 2015.

6

Dr. McGarity determined that during Mr. Greaud's treatment, Defendant prescribed 7,754 Lortab; approximately 6,000 Soma; approximately 5,000 Xanax; 1,530 Trazadone; 1,320 Lyrica; 840 Neurontin; 810 Adderall; 210 OxyContin; and 81 ounces of Tussionex. He affirmed that "the gross number is important when looking at the picture of how these drugs are reacting in someone's body."

Dr. McGarity stated that the elevated levels of hydrocodone noted in the toxicology report did not mean that Mr. Greaud ingested a larger amount of the drug prior to his death than prescribed. In explaining his reasoning, he said that the hydrocodone level was higher than the therapeutic range due to postmortem redistribution as the blood drawn for the test was taken from Mr. Greaud's heart following his death:

> When you take medicine, it gets into your tissue and stays there. It's not hurting you. It's just there because you've been exposed to that drug. When you die, then those drugs that have been in your heart, or wherever, actually move back into the blood stream, and then when they draw the blood level [sic] at the time of death the level is higher than it normally would have been because of what's called postmortem redistribution.

However, when asked if the hydrocodone level would have been within the therapeutic range if the blood had been drawn right before Mr. Greaud died, Dr. McGarity stated, "Could have been." As to whether postmortem redistribution caused the coroner to reach an erroneous finding of polydrug overdose, he stated, "Well, postmortem redistribution is a fact that you have to deal with."

Dr. McGarity discussed the half-life of oxycodone, the time it takes for the effect of a drug to dissipate in the body, and its relevance to this matter, stating, "The half-life is the time it takes for it to drop one-half or fifty percent (50%) of what it was[,]" and he agreed that the half-life of oxycodone is three and a half hours.

7

When asked, "if someone took OxyContin three hours before you did a blood test, would you see OxyContin show up on the blood test results or would you see something else show up on the blood test results[,]" he replied, "[y]ou would see the metabolized versions. You would see both." Thereafter, the following colloquy occurred between Dr. McGarity and counsel for Defendant:

Q. Because you can tell how long it has been that someone has took [sic] OxyContin because the blood test will show a metabolized version of the OxyContin if it was taken earlier in its half-life. Isn't that true?

A. Yes.

Q. So, in this case, in the postmortem drug blood test we didn't see any metabolized markers of OxyContin on the blood test result, did we? You want to see it?

A. We saw what the lab reported.

Q. It only reported OxyContin. It didn't report the metabolized versions of OxyContin, did it?

A. No, sir, I don't believe so.

The coroner, Dr. Dawson, testified that he listed the cause of death on Mr. Greaud's death certificate as polydrug overdose based on the toxicology report and the manner of death as "'could not be determined[.]'" He said that the drugs found in Mr. Greaud's body were presumably prescribed since no illegal drugs were found and that there was no indication that his death resulted from an intentional overdose. He opined that based on the information known, Mr. Greaud more likely than not died due to a prescription drug overdose.

Dr. Dawson admitted that he did not see Mr. Greaud's body postmortem since an investigator from his office investigated the death. He was unsure if the investigator saw Mr. Greaud's body in situ prior to drawing blood for the toxicology report from the body at the funeral home. He further admitted that absent an autopsy,

8

the investigator could not determine if Mr. Greaud died due to a medical emergency such as a heart attack.

Dr. Dawson did not recall if he knew there was an altercation between Plaintiff and Mr. Greaud prior to his death. If he had known, he stated, he would have instructed his investigator to look for signs of trauma on Mr. Greaud's body. Absent this instruction, the investigator, who is trained to look for signs of trauma, would have noted if any such signs were present when he examined the body. He further testified that if Mr. Greaud were being treated for seizures prior to his death, an anti-convulsant medication other than gabapentin would likely have showed up on the toxicology report. He stated that the fact that Mr. Greaud's brain scans were negative for signs of seizure would not have changed his opinion regarding the cause of death.

Dr. Dawson testified that while his office often inventories a decedent's prescription medication, it does not confiscate them. In this instance, he did not know if an inventory was taken of Mr. Greaud's medication. When asked how many Xanax pills would have to be taken to cause an overdose, he stated:

> A.     . . . [I]f you look at the concentrations and – and – and polydrug means all of the drugs worked together to cause the death. And, you know, the – the thing on this one that really jumps out to me is the Oxycodone level –
>
> Q.     Okay.
>
> A.     – which is twice the therapeutic range. To me that plus the Hydrocodone plus the Alprazolam all of which are respiratory depressants. The combination of those three is what he died from.
>
> Q.     So if he took twice the dosage of Oxycodone for instance, okay –
>
> A.     Uh-huh, (yes).
>
> . . . .

9

Q.  -- wouldn't that lead you to the conclusion that it was not accidental that – that he purposely took a greater amount of the Oxycodone than he was prescribed.

. . . .

A.  That is correct.

Dr. Dawson said that he had no information indicating that Mr. Greaud ingested a bottle of oxycodone pills prior to his death or that he committed suicide. He admitted that even with an autopsy, it is impossible to determine whether an overdose was accidental or intentional. He agreed that a finding of suicide is based on the information surrounding the decedent's death, including any past history of drug abuse. He stated that here, the only thing that caught his attention was the levels of oxycodone and hydrocodone, both of which were outside the therapeutic levels. As to whether a person committing suicide would more likely take only their pain medications as opposed to all of their prescribed medications, Dr. Dawson stated, "Very often they take anything they have sitting on the counter." He testified that the combination of amphetamines, Xanax, hydrocodone, and oxycodone found in Mr. Greaud's system was enough to cause his death even if they were prescribed.

Dr. Jeffrey Grizzaffi, a podiatrist who treated Mr. Greaud for fourteen months, ending on February 9, 2015, testified that although Norco[2] was prescribed following Mr. Greaud's December 17, 2013 ankle surgery, he requested more pain medication the next day due to pain at the surgical site. When he instructed Mr. Greaud to increase the Norco to two pills every four hours, Mr. Greaud admitted that he had already done so. After Dr. Grizzaffi called out a prescription for another pain medication, Mr. Greaud requested a pain patch, which Dr. Grizzaffi refused. He said,

---

[2] The dosage of Norco prescribed contained 10 mg of hydrocodone and 325 mg of acetaminophen.

10

"there's just no reason for that much pain medication post-operatively, even at the beginning[,]" and that he had never had a patient request the amount of pain medication requested by Mr. Greaud. However, he admitted that Mr. Greaud's request was possibly due to pain resulting from his failure to comply with his non-weightbearing restrictions following surgery.

Dr. Grizzaffi testified about a conversation he had with Mr. Greaud regarding him taking "more of the hydrocodone than what he was supposed to and kind of taking the Toradol that we kind of had with them to alternate and he was taking double or more than that." At that time, he denied Mr. Greaud's request for a pain patch in addition to the other medications he was taking. He said that based on the information he had, Mr. Greaud had taken sixty pain pills in nine days post-surgery, and he wondered if he needed that much pain medication because of the pain he was in due to non-compliance or because of an addiction problem.

In recalling Mr. Greaud's behavior at his appointments, Dr. Grizzaffi testified that it "seemed odd" and "like he's spaced out a lot most times." He concluded that "[i]t seemed like he was using pain medication I would say more for the benefits from that standpoint as far as for like his ankle and his pain[.]" He stated that he started weaning Mr. Greaud off hydrocodone after he spoke to Plaintiff and after he learned that Mr. Greaud had other prescriptions for hydrocodone. However, he admitted that Mr. Greaud only exhibited drug-seeking behavior during the month following his surgery. He stated, "some people are – have very little pain tolerances and need a lot of medication, and sometimes people can show . . . addiction capabilities."

Dr. Jeffrey Chen, an interventional cardiologist, treated Mr. Greaud for approximately two years prior to his death. He testified that Mr. Greaud initially

11

presented with bradycardia, orthopnea (shortness of breath while lying down), dyspnea (shortness of breath), mitral valve prolapse, dizziness, syncope (loss of consciousness), weakness, mitral regurgitation, and chest pain. A December 12, 2013 stress test revealed a mild blockage, which reduced the blood flow to the tip of his heart. However, a left-heart catheterization, performed on December 31, 2013, revealed insufficient blockage to require a stent. He stated that an August 7, 2014 cardiovascular screening determined that Mr. Greaud was at moderate risk for heart attack and stroke, and testing performed on October 2, 2014, revealed mild peripheral arterial disease in his lower legs.

Mr. Greaud complained of neck tightness, jaw pain, and headaches with right-eye pain on December 9, 2014. He complained two days later of episodes of near syncope, chest discomfort with radiation to his jaw, chest tightness, and cinching chest pain. According to Dr. Chen, these were possible symptoms of a heart blockage. An ultrasound revealed no blockage in the carotid arteries, whereas a nuclear stress test revealed the possibility that his blockage had worsened. Dr. Chen opined that while Mr. Greaud's blockage was possibly slightly worse than the previous year, it was not serious.

Dr. Chen testified that when he last saw Mr. Greaud on January 22, 2015, he complained of chest pain, shortness of breath, ankle swelling, severe dizziness, and syncope episodes. He said that he learned of Mr. Greaud's death on April 17, 2015, when Plaintiff left the following message: "[Patient's] wife called to inform you that Mr. Greaud passed away on Saturday. She states he had been having seizures and that last time that she checked on him he was unresponsive. [T]he ambulance tried to revive him but was unsuccessful." Dr. Chen testified that he neither treated Mr. Greaud for seizures nor recalled any mention of seizures in his chart.

12

Dr. Chen testified that while Mr. Greaud's heart condition was legitimate, it was not acute as of January 22, 2015. If there had been a critical blockage in his heart, he would have taken different treatment measures. He testified that his only concern at that time was stress cardiomyopathy,[3] a non-preventable condition. However, he stated that the medication he was prescribing should have protected Mr. Greaud. While he did not believe that Mr. Greaud was at imminent risk of a fatal heart attack, he admitted that such a prediction is impossible to make.

Dr. Chen stated that Mr. Greaud's episodes of dizziness and syncope were possibly related to his bradycardia. Syncope can also occur when a heart functions inadequately due to blockage. He said that Mr. Greaud's dyspnea was possibly related to mitral regurgitation as shortness of breath can occur when a prolapsing mitral valve allows the backwards flow of blood in the heart, resulting in too much blood in the lungs.

Dr. David Weir, a neurologist, treated Mr. Greaud for approximately two years prior to his death. During that time, Mr. Greaud complained of headaches, migraines, obstructive sleep apnea, fatigue, seizures, and syncope. Dr. Weir explained that syncope, or loss of consciousness, is typically caused by neurological or cardiovascular issues. If neurological in nature, it is caused by headaches, seizures, and brain tumors. The cardiovascular causes of syncope are a dramatic drop in blood pressure or an arrhythmia such as a decreased heart rate, which reduces the flow of blood to the brain.

---

[3] Stress cardiomyopathy, also known as "broken heart syndrome," "is a heart condition that's often brought on by stressful situations and extreme emotions." Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/broken-heart-syndrome/symptoms-causes/syc20354617 (last visited October 25, 2024).

Dr. Weir explained that sleep apnea occurs when a person's airway is completely closed during sleep by the posterior pharynx, causing the person to temporarily stop breathing. Obstructive sleep apnea (OSA) occurs when a person experiences more than five apneic events per hour. He stated that the continuous positive airway pressure (CPAP) device used by Mr. Greaud when sleeping, opens the airway, preventing apneic events.

According to Dr. Weir, a person with OSA will experience chronic daily fatigue and a higher risk for a cardiac arrhythmia, which can lead to syncope, clots, stroke, and death. There is "a higher incidence of seizures in patients with obstructive sleep apnea because of not sleeping well, irritating the brain and, you know, and having these episodes of arrhythmia." He further said that it is not uncommon for a person with OSA, especially untreated OSA or one who is non-CPAP compliant, to fall asleep while sitting at the table or while driving or sitting at a red light.

Dr. Weir's records indicate that Mr. Greaud reported that he suffered a severe migraine while driving on November 21, 2013, that he passed out after pulling off the road, and was found two hours later by the police. When asked if this was a cerebrovascular event, he listed vasospasm of the brain, seizure, an embolus caused by a stroke, or a cardiac-related event as the possible causes. However, he noted that no seizure activity was detected in Mr. Greaud's brain on a December 11, 2013 EEG. Two days later, Mr. Greaud complained of right upper extremity issues, headaches, and memory loss, which Dr. Weir related to his OSA. A March 17, 2014 MRI of the brain was essentially normal.

On April 17, 2014, Mr. Greaud complained that he would wake up ten to thirty times a night and would stop breathing while on the CPAP device. He also complained of daytime sleep onset and cluster headaches. On April 21, 2014, he

14

reported difficulty sleeping while on the CPAP device. The record states, "Does have some seizure activity as reported by Pt. States last week while driving blacked out and next thing he noticed was at the hospital in Crowley. Officer at the scene stated he was staring and arms were shaking and body was flaccid." It further states that on April 15, 2014, "'seizures' [without] warning or aura, denies dizziness, visual changes or other sensorineural disturbances[.]" Dr. Weir stated that two possible causes of this event were seizure and a drop in blood pressure.

Dr. Weir testified that an April 24, 2014 sleep study revealed that in addition to OSA, Mr. Greaud was also suffering from central sleep apnea whereby no signal to breathe was sent by the brain, causing him to suddenly stop breathing. As a result, Mr. Greaud was switched to a bilevel positive airway pressure adaptive servo-ventilation (BiPAP ASV) device, which controlled his central sleep apnea.

Dr. Weir testified that when he last saw Mr. Greaud on March 26, 2015, he complained of right upper extremity issues, headaches, increased neck pain, and episodes of vertigo and near syncope with neck movement and extension. He ordered magnetic resonance (MR) angiograms of the blood flow in Mr. Greaud's head and neck to determine if pinched arteries in his neck was the cause of his syncope. However, no flow limiting stenosis was revealed by the April 7, 2015 tests. An MRI of the brain performed that same day revealed no acute central nervous system abnormality.

Dr. Weir, who is also a registered pharmacist, discussed the effect that the "multiple forms of hydrocodone, benzodiazepines, [and] CNS, central nervous system depressants[]" prescribed by Defendant would have on Mr. Greaud's sleep apnea:

15

Well, it increases the possibility that they might pass out, sure, on the basis of, you know, several different mechanism [sic], of course. You know, I mean, it could make them drowsy during the course of the day and cause them to, you know, fall asleep. It could – it could increase, you know, interruptions of sleep during the night, you know, which would make them more fatigued and drowsy during the day. And so those are the kind of things that could easily do [sic], and increase apneic events during the night.

However, he was not surprised that Defendant prescribed higher and higher dosages of opioids as Mr. Greaud "was having a bunch of different areas of pain[.]" As to whether these increasing dosages were responsible for Mr. Greaud's syncope, he stated, "It could be an interaction between those things, yes." While Mr. Greaud related his syncope to sleep apnea, fatigue, and headaches, Dr. Weir said that there were multiple potential causes for these episodes.

Dr. Peter Vizzi, an orthopedic surgeon, treated Mr. Greaud over twenty months for left shoulder, right elbow, and left ankle complaints. When he first saw Dr. Vizzi on January 19, 2012, Mr. Greaud was taking Lortab, fentanyl, Zipsor (muscle relaxer), Soma, Lyrica, trazodone, Zoloft, Norvasc, and Xanax. Dr. Vizzi's February 9, 2012 note indicates that Mr. Greaud questioned him about pain medication:

He is on a fentanyl patch, Lortab, and Soma. This degree of pain medication is beyond my expertise. I explained that I treat postoperative pain or acute pain from fractures and such. I do not feel comfortable prescribing a fentanyl patch. I explained that his primary physician, who has been prescribing this, could certainly continue with the prescription of this. If his primary physician would prefer to not continue this, then a pain management doctor may be the best option for him. He understands my concern.

After two procedures were performed on Mr. Greaud's right elbow on August 7, 2013, he complained the next day of "moderate to severe incisional pain, not relieved with the Norco." Dr. Vizzi prescribed 10 mg of Toradol, one pill every six hours. Mr. Greaud requested more Norco seven days later following "a bad day

16

yesterday – swelling and bruised from shoulder to wrist[.]" Dr. Vizza prescribed Norco, "one tablet every four to six hours as needed for pain, but no more than eight in one day." Mr. Greaud requested more pain medication six days later on August 21, 2015. Dr. Vizzi prescribed a lower dose of hydrocodone, to be taken "every 6-8 hours as needed for pain[.]"

Dr. Vizzi testified that he received a warning from Express Scripts[4] the next day, stating that Mr. Greaud had *"received (either) seven or more controlled substances prescriptions (or) a large daily dose of controlled substance*[]" and *"controlled substance prescriptions from (either) two or more providers (or) three or more pharmacies."* (Asterisk omitted.) The attached information indicated that in addition to his prescriptions for Norco filled on August 9, 2013 and August 15, 2013, Mr. Greaud also filled a prescription from Defendant for 120 pills of hydrocodone-acetaminophen, 10-500 mg, on August 6, 2015.

Despite this information, Dr. Vizzi felt that his August 9 prescription was proper based on what he knew at the time. He stated, "I've just operated on somebody and they need some type of different medication, it doesn't affect what I do. Because, again, I'll – they're treating the chronic pain, but surgery can increase their discomfort, so we do alter their pain dosing. We have some responsibility for the operative pain control." He further explained that during the time he treated Mr. Greaud, physicians faced "liability for not treating pain well enough. And as a matter of fact, the state board, and even the legislature, had suggested penalties if we didn't treat pain."

---

[4] According to the letter, "Express Scripts, which administers the Controlled Substance program on behalf of health plans and plan sponsors, identifies patients who may be receiving multiple controlled substance prescriptions or large quantities of controlled substances on a daily basis that are being prescribed by multiple physicians and/or being filled at multiple pharmacies."

Dr. Zebediah Stearns, a family medicine physician and member of the medical review panel, testified that the panel concluded that the evidence submitted failed to support Plaintiff's claim that Defendant breached the standard of care applicable to family medicine physicians. In summarizing the panel's opinion, he stated:

> We felt that in prescribing medications, he was monitoring him, that he changed medications when they weren't effective or had some other side effects, that he also referred him to the proper specialists to not only try to treat the symptoms that he had and the medical conditions that he had to see if something that could be corrected, and generally continued to follow him and monitor him in an appropriate way while he was on these medications.

Dr. Stearns stated that the panel found that Defendant monitored Mr. Greaud more closely during the eighteen months prior to his death by seeing him more frequently and by talking to him and Plaintiff. He stated that the fact that Defendant increased the number of opioids and controlled substances prescribed during that time did not infer that he was less vigilant in treating Mr. Greaud. He explained that a patient will become less responsive to pain medication over time as their body begins breaking down the medication more efficiently and delivers it into the bloodstream more quickly. Thus, to obtain the same effect from a lower dose that is metabolized quicker, the patient has to take the medication an increased number of times per day.

Dr. Sterns opined that the total number of pills prescribed by Defendant over six years was inconsequential as the number that really mattered was the number of pills prescribed per month. While adverse effects can result from taking the combination of Lortab, Soma, and Xanax, the possibility of adverse effects would not increase over time. He explained, "If they've historically been on it and haven't had any problems for six years and they're taking it appropriately, then it would have minimal risk." While Dr. Sterns knew that this combination drugs was referred to as

18

the "Houston Cocktail" and "Holy Trinity," he was unsure if it was considered dangerous by the medical community in 2009–2015. However, he noted that these drugs were commonly prescribed for chronic pain during that time and that he still prescribes them now to his patients with chronic pain.

Dr. Sterns affirmed that a knowledge of drug interactions is important. He further agreed that he would reevaluate a patient's treatment if he received an Express Scripts warning him that the drugs he was prescribing had a strong potential for abuse, overdose, or death. However, he opined that Defendant complied with Express Scripts's warning even if he never received it as long as he reviewed Mr. Greaud's medications and evaluated him every visit.

Defendant testified that he satisfied the standard of care applicable to family medicine physicians while treating Mr. Greaud and that he was not responsible for his death. He further stated that he would change nothing about the treatment he provided Mr. Greaud. He also claimed that his prescription of medication to Mr. Greaud was not financially motivated as he only earned about $1,500.00 while treating him.[5] His only motivation being that Mr. Greaud "was a good, outstanding person who came to my office."

Defendant denied that Mr. Greaud ever exhibited drug seeking behavior because he would have discharged Mr. Greaud from his care had he done so. While Mr. Greaud occasionally requested pain medication, Defendant only prescribed the medication when it was appropriate based on Mr. Greaud's presentation. Defendant stated that Mr. Greaud requested an early refill on May 13, 2009, after claiming that

---

[5] While we acknowledge some difficulty in differentiating between a visit and a call in Defendant's records, we find that Mr. Greaud was seen by him approximately forty times. Defendant testified that he only saw Mr. Greaud twenty or twenty-five times.

19

his medication was stolen, which Defendant denied as he does not refill narcotics. Defendant, although he had seen Mr. Greaud only twice before his request, did not consider this drug-seeking behavior, and he stated that Mr. Greaud never again claimed that his pain medication was stolen. His records further indicate that on November 18, 2011, Defendant was informed by a pharmacy that out of all his medication, Mr. Greaud only wished to fill his Lortab and Soma prescriptions.

Defendant testified that he stopped treating patients for chronic pain in 2015, after the state recommended a reduction in the number of pain medication prescriptions written by family medicine physicians and required more frequent urine drug screens of patients receiving such medication. Before 2015, he had provided pain management treatment for fifteen years, and the percentage of his patients that received such treatment was ten percent.

Defendant testified that the first time he saw Mr. Greaud, he complained of low back and left shoulder pain, for which he prescribed Mobic (anti-inflammatory), Soma, and Lortab (twice daily as needed for pain). At that time, Mr. Greaud was already taking Zoloft and Klonopin (a benzodiazepine anti-anxiety drug). He stated that it was within the standard of care for him to prescribe Lortab based on Mr. Greaud's presentation and complaints.

Defendant next saw Mr. Greaud on May 26, 2009, for complaints of tendinitis, low back pain, increased blood pressure, anxiety, and allergic rhinitis. Defendant stated that he prescribed Lortab, Soma, and Klonopin, a combination he and other family medicine physicians had used for years to treat chronic pain.

Defendant testified that he saw Mr. Greaud on December 22, 2009, after he blacked out and was taken to the emergency room by EMTs, who thought he had suffered a stroke. However, he left the emergency room before he was seen.

20

Defendant stated that he diagnosed Mr. Greaud, who looked completely normal, with a possible syncope episode and ordered a CT scan, an EEG, and a twenty-four hour Holter monitor of his heart. He requested the heart monitor due to Mr. Greaud's occasional bradycardia and because he was told while at the emergency room that his heart rate was slow.

Defendant stated that he first prescribed Xanax to Mr. Greaud on July 22, 2010. He explained that Xanax and Klonopin, both benzodiazepines, are valium-like drugs, and that he switched Mr. Greaud to Xanax because it stays a shorter time in the system than Klonopin. He said that he wanted the drug to be in Mr. Greaud's system only when needed for anxiety or panic attacks.

Defendant's records indicate that on June 16, 2014, Plaintiff "reported patient is falling asleep with face in plate, very disoriented and confused. Refused to quit driving and is very reckless on the road. She doesn't know if it is due to seizures or substance abuse." Defendant stated that he took this information very seriously and scheduled an appointment to see both Mr. Greaud and Plaintiff. When he saw them, he took Mr. Greaud off Lyrica and Soma. Regarding Plaintiff's statement that she wanted an intervention regarding Mr. Greaud's prescription medication, Defendant stated, "I never do interventions[,]" explaining that "we cannot just get somebody off of all of his mediations and say, 'Have a good day.'" He said that Plaintiff appeared to be satisfied that he had taken Mr. Greaud off some of his medication.

According to Defendant, the only appointment Mr. Greaud missed was on June 31, 2014, after he reported that Plaintiff had taken all of his narcotic medication and kicked him out of the house. He did not see Mr. Greaud again until August 18, 2014, at which time he was back with Plaintiff and was relying more on religion. He told Defendant that he was off Norco and wanted to take Soma regularly, and that

21

Lyrica had caused weakness. Defendant stated that because Mr. Greaud was off Lortab, he started him back on Soma. He stated that on October 17, 2014, he prescribed Tussionex for Mr. Greaud's cough and Butrans (an opioid patch) for his left-shoulder pain. He said that he replaced the Butrans patch with Norco on November 10, 2014, as it failed to reduce Mr. Greaud's pain. Defendant noted that on December 16, 2014, Mr. Greaud complained of neck and shoulder pain and reported that Plaintiff complained that he was on too much pain medication. Based on Mr. Greaud's complaints, Defendant switched him from Lortab to an extended-release oxycodone and prescribed Norco for breakthrough pain.

Defendant's last appointment with Mr. Greaud was on April 10, 2015, the day before he died. He stated that despite his pain complaints, Mr. Greaud looked well, was in good spirits, and he saw nothing that indicated he was experiencing physical or mental problems. Defendant testified that he was still concerned about Mr. Greaud's "stress and the condition [sic] that he was going through with his wife[,]" which he mentioned every time he saw Defendant. He said that Mr. Greaud was stressed because he was unable to work and provide for his family following his ankle surgery. He felt that this explained why Mr. Greaud sold his possessions. He also knew that Mr. Greaud had applied for short-term and long-term disability and Social Security.

Defendant stated that at the time of his last visit, Mr. Greaud was on fourteen prescription medications, eight of which were prescribed by him. He stated that of the remaining six medications, Bystolic and Ranexa were prescribed by Dr. Chen, Cymbalta was prescribed by Dr. Grizzaffi, Halcion and Topamax were prescribed

22

by Dr. Weir, and Omeprazole was prescribed by Dr. Ahluwalia.[6] Defendant said that while he occasionally received notes from these specialists, it was not customary for him, as a family medicine physician, to provide his notes to them. He further stated that he never spoke to any of these specialists regarding their treatment of Mr. Greaud.

Defendant said that although he receives warnings from Express Scripts, no warnings dated January 5, 2015 or April 21, 2015, were found in Mr. Greaud's chart.[7] He claimed that these letters may have been sent to the wrong address since he moved his office in "2012 to 2015 While he considers such warnings, Defendant was not certain that he would have taken Mr. Greaud off Xanax, oxycodone, and Soma had he received the January 5 letter. "I would have had to have a talk with him to see how he feels about it, and what is he thinking, and how is his condition." He added, "I have patients that have been on those for many, many, many, [sic] years and they did just fine and dandy[.]"

As to Express Scripts's warning regarding the "Houston Cocktail" and the "Holy Trinity," Defendant explained that the medications that make up this drug

---

[6] Dr. Jatinder Ahluwalia, a gastroenterologist, was treating Mr. Greaud for burning epigastric pain.

[7] According to Express Scripts's records, the following warning was sent to Defendant on January 5, 2015:

> Our claims record suggests that your patient is receiving carisoprodol as well as an opioid analgesic and a benzodiazepine. Known as the "Houston Cocktail" or "Holy Trinity", this combination has been subject to misuse; its strong abuse potential and additive central nervous system depressant effects may result in an increased risk of serious adverse drug events. Clinicians are encouraged to be vigilant for legitimacy of therapeutic use as well as potential inappropriate prescribing. If you have recently changed your patient's therapy, please ensure that the patient is receiving the intended agent. In light of the risks of addiction, abuse, and misuse and the greater risks of overdose and death associated with this combination, please consider whether changes in therapy are warranted.

cocktail, Xanax, Lortab, and Soma, had been prescribed for chronic pain for many years prior to "the epidemic that they talked about as far as people overdosing on narcotics and opioids[]" and "at some point, it became really hot, and people started abusing it." He went on to state that "at that point, . . . the State basically decided no, you're not going to write those things together."

Defendant stated that while treating Mr. Greaud, his long-term goal was to resolve his chronic pain, and during the years he treated him, there was "[n]o conversation about getting [him] off" pain medication. As to whether he would have continued Mr. Greaud on pain medication if he had not died, Defendant replied, "if he was in pain, I probably would have yes."

At the conclusion of the five-day trial, the jury rendered a verdict finding that Defendant breached the standard of care while treating Mr. Greaud but that his substandard conduct was not the cause of his injuries and/or death. A written judgment in conformity with the jury verdict was rendered by the trial court on May 11, 2022, dismissing Plaintiff's claims against Defendant, with prejudice. It is from this judgment that Plaintiff appeals.

On appeal, Plaintiff asserts that the jury committed manifest error in finding that Defendant's substandard conduct did not cause her husband's injuries and/or death.

**OPINION**

In her sole assignment of error, Plaintiff argues that the jury was manifestly erroneous in not finding by a preponderance of the evidence that Defendant's substandard conduct caused Mr. Greaud's injuries and/or death. Considering the standard of review applicable to a jury's factual findings as to causation, we disagree.

24

In a medical malpractice action, "plaintiff has the burden of proving the applicable standard of care, its breach, and causation." *Pfiffner v. Correa*, 94-924, p. 4 (La. 10/17/94), 643 So.2d 1228, 1231. In addition to the other elements, "[a] plaintiff must also establish, with adequate evidence . . . a causal connection between a [physician's] negligence and the plaintiff's injuries." *Id.* at 1230. The elements of proof in malpractice cases, including causation, are codified in La.R.S. 9:2794(A), which provides:

In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., . . . the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians. . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

The supreme court, in *Snider v. Louisiana Medical Mutual Insurance Co.*, 14-1964, p. 5 (La. 5/5/15), 169 So.3d 319, 323, set out the manifest error standard of review, as follows:

It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). This test dictates that a

25

reviewing court must do more than simply review the record for some evidence that may controvert the trial court ruling. Rather, it requires a review of the entire record to determine whether manifest error has occurred. Thus, the issue before the court of appeal is not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one. *Clay v. Our Lady of Lourdes Regional Medical Center*, 11-1797 (La.5/8/12), 93 So.3d 536, 543. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01-2217 (La.4/3/02), 816 So.2d 270, 278–79. Where the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. *Bellard v. American Central Ins. Co.*, 07-1335 (La.4/18/08), 980 So.2d 654, 672.

As a finding of causation is a question of fact, it will not be reversed absent manifest error. *Collins v. Nat'l Healthcare of Leesville, Inc.*, 12-502 (La.App. 3 Cir. 11/7/12), 101 So.3d 1110.

Although Plaintiff argues that the jury erred in finding that she failed to prove the causal element, we note that while the verdict form does reflect its finding that she proved the applicable standard of care required of Defendant and that the standard of care was breached, it fails to specify what standard of care was, in fact, breached. In her petition and in the evidence and argument presented to the jury, Plaintiff set forth multiple standards of care and breaches thereof that she claimed were the direct and proximate causes of Mr. Greaud's injuries/death, including:

a)    Failure to properly monitor drug usage of [Mr. Greaud];

b)    Failure to properly prescribe medications to [Mr. Greaud];

c)    Failure to manage outside medication prescriptions of [Mr. Greaud];

d)    Failure to properly consult with and treat [Mr. Greaud] prior to prescribing medications;

e)    Failure to properly screen prior drug usage of [Mr. Greaud];

26

f)     Failure to properly screen [Mr. Greaud] for ongoing concerns of drug abuse and overdose;

g)    Failure to consider drug contraindications in the drug regime of [Mr. Greaud];

h)    Failure to recognize and treat drug-seeking, addictive, and abusive behaviors toward drugs in [Mr. Greaud];

i)    Failure to order appropriate testing to confirm medical diagnoses requiring medications for [Mr. Greaud];

j)    Failure to order appropriate drug and urine testing for [Mr. Greaud];

k)    Failure to recognize [Mr. Greaud's] deteriorating physical and mental conditions; and

l)    Failure to prevent [Mr. Greaud's] overdose.

Did the jury find that all alleged standards of care were breached? If not, which one or more were breached? Given that the generic verdict form fails to specify which standard of care was breached, we are unable to determine with any legal certainty what specific evidence overwhelmingly supported or failed to support any causal connexity between the breach of the standard of care and Mr. Greaud's injuries/death. While we note that Dr. Libert opined that Defendant breached the standard of care by continuing to prescribe increasing amounts of narcotic medication, we cannot conclude from the record whether this was the standard the jury determined was breached. Even assuming arguendo that it was, a causal connection between an intentional or even an accidental overdose from these medications cannot be automatically imputed or implied between Mr. Greaud's injuries/death and Defendant's actions.

In addition, we find that the jury was presented with evidence upon which it could reasonably have found a lack of causation between the breach of the standard of care and Mr. Greaud's injuries/death. While Dr. Libert opined that Mr. Greaud's

27

death was caused by a drug overdose based on the amount of drugs found in his system, he conditioned this by stating, "Without an autopsy, we cannot – we cannot prove or rule out this being a heart attack or a stroke or any – or any number of things[.]" As reflected above, the jury heard substantial testimony about the other medical conditions suffered by Mr. Greaud, including heart, neurologic, and orthopedic issues.

In addition, the testimony of the coroner, Dr. Dawson, was enough, in and of itself, to support the jury's finding of no causation. He stated that the level of oxycodone was "twice the therapeutic range" and "that plus the Hydrocodone plus the Alprazolam all of which are respiratory depressants" caused Mr. Greaud's death. However, when asked "if [Mr. Greaud] took twice the dosage of Oxycodone for instance," "– wouldn't that lead you to the conclusion that it was not accidental that – that he purposely took a greater amount of the Oxycodone than he was prescribed[,]" Dr. Dawson replied, "That is correct." This testimony, together with Dr. McGarity's testimony concerning the half-life of oxycodone and the fact that no metabolites thereof were found in Mr. Greaud's system following his death, could lead to the conclusion that the twice the therapeutic level of oxycodone found in his system was taken shortly before his death. Thus, the jury could have reasonably concluded that the drugs were consumed intentionally, or at the least accidentally, by Mr. Greaud in greater quantities than prescribed. Neither scenario leads to the conclusion, without more, that Defendant's undisclosed breach of a standard of care directly or even indirectly caused Mr. Greaud's death.

While there is evidence contrary to the jury's verdict as to causation, a review of the entire record does not establish that the jury was manifestly erroneous in its conclusion. As the trier of fact, the jury is not bound by the testimony of an expert,

which is evaluated the same as other evidence. *Bernard v. BFI Waste Serv., LLC,* 20-636 (La.App. 3 Cir. 7/21/21), 325 So.3d 415, *writ denied,* 21-1271 (La. 11/17/21), 327 So.3d 995. Further, the weight and effect afforded to expert testimony is within the jury's broad discretion, and its decision to accept or reject such testimony, in whole or in part, will not be disturbed on appeal absent an abuse of discretion. *Id.*

The issue before this court is not whether the jury was right or wrong, or whether we would have reached a different result had we been sitting in its stead, but whether the fact-finder's conclusion was a reasonable one. Based on our review of the record, we find that there was a reasonable factual basis for the jury's finding of a lack of causation between Mr. Greaud's injuries and/or death and Defendant's conduct. Accordingly, the judgment of the trial court based on the jury's verdict is affirmed.

## DECREE

For the foregoing reasons, the judgment of the trial court in favor of Jahanyar Khorsandi, M.D., and dismissing all claims of Angela Greaud, individually and on behalf of Steven Greaud, with prejudice, is affirmed. All costs of this appeal are assessed to Angela Greaud.

**AFFIRMED.**

29